52 A.3d 1010

**Janet KALMAN**

v.

**Jose FUSTE.**

**No. 1617, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Sept. 5, 2012.

390

Joyce M. Kosak, Rockville, MD, for appellant.

Ross D. Hecht, College Park, MD, for appellee.

Panel: EYLER, DEBORAH S., MATRICCIANI, JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

MATRICCIANI, J.

On July 31, 2008, the Circuit Court for Frederick County awarded appellee, Jose Fuste ("Father"), an absolute divorce from appellant, Janet Kalman ("Mother"). The court granted the parties joint legal custody of their Daughter and granted Mother primary physical custody, with Father to have liberal visitation.

Despite Mother's relocation to Florida with Daughter, the parties continued to litigate custody disputes in Maryland. On January 20, 2011, Father filed a petition to modify his visitation with Daughter in the Circuit Court for Montgomery County. On April 13, 2011, Mother filed a petition to modify custody, also in Montgomery County, along with her answer to Father's petition to modify visitation. The circuit court conducted a scheduling hearing on May 2, 2011, where it set a merits hearing on the modification petitions for August 29, 2011.

Just prior to the August 29 merits hearing, Father filed an Emergency Motion for Custody with an accompanying affidavit asserting that Mother had been arrested in Florida and charged with felony possession of a controlled dangerous substance (the drug hydrocodone) with intent to distribute. Mother did not respond to this motion, but a circuit court judge granted the motion the day it was filed, pending the outcome of the hearing on August 29, 2011.

Mother appeared with counsel for the hearing on August 29 and challenged the Maryland court's continuing jurisdiction over Daughter's custody, as well as the basis for emergency jurisdiction. A second judge found that the Circuit Court for Montgomery County had continuing jurisdiction over Daughter and concluded that the Mother's legal troubles in Florida created an emergency requiring a modification in custody. The court awarded Father temporary sole legal and physical custody of Daughter, with reasonable visitation for Mother and Daughter's grandparents, pending the outcome of further custody proceedings. The court set a status conference for November 30, 2011, to reevaluate the parties' situations. The

judge suggested that one of the parties would have to file a complaint in order to obtain a "final custody" hearing. Mr. Fuste did that on September 6, 2011. On October 3, 2011, Ms. Kalman noted an appeal from the temporary custody order dated September 2, 2011.

## QUESTIONS PRESENTED

Appellant's brief presents three questions for our review, which we have combined into two as follows:

I. Did the circuit court err when it held that it had continuing exclusive jurisdiction to entertain appellee's emergency motion without determining whether the jurisdictional requirements of FL § 9.5–202(a) were satisfied?

II. Did the circuit court err in finding that the unstable circumstances of appellant in Florida constituted an emergency requiring a temporary modification of child custody?

For the reasons that follow, we answer yes to both questions, we vacate the judgment of the circuit court, and we remand for further proceedings.

## FACTUAL AND PROCEDURAL HISTORY

The parties were married in 1997 and resided in Maryland until Mother became pregnant with their child. At that point the parties separated and Mother moved to Florida, where she gave birth to Daughter on July 14, 2006. The parties finalized their divorce in the Circuit Court for Frederick County in July of 2008, agreeing that Mother would be Daughter's primary physical custodian and that Father would retain the right to liberal visitation.

Mother raised Daughter in Florida with the help of Daughter's maternal grandmother and paternal grandparents. Father visited three to four times each year until 2011, when he began visiting monthly. Prior to the events of this case, Daughter had spent only one week in Maryland, on the occasion of her fifth birthday in July of 2011.

On August 14, 2011, Daughter was with Father's parents when Florida police detained Mother on a charge of shoplifting. The arresting officers found in her possession a bottle of hydrocodone whose prescription label bore someone else's name. Mother was arrested and charged with theft and drug trafficking, held overnight, and released on her own recognizance.

When Father learned of Mother's arrest, he decided to remove Daughter to Maryland. He traveled to Florida and told Mother that he and his parents would watch Daughter overnight on August 23, 2011, while Mother finished moving into a new residence. That evening, Father returned to Maryland with Daughter, and the next day filed an emergency motion for custody in the Circuit Court for Montgomery County. In an affidavit supporting his motion, Father stated that he believed Mother was using and possibly selling drugs and would abscond with Daughter to Switzerland, where Mother is also a citizen. Father averred that Mother had been terminated from her employment and could lose her license to practice nursing, and that she was residing with her sister, who had two pending theft charges, and with "a live-in boyfriend who has a prior drug conviction." Father stated that Mother's "arrests are a drastic change in [her] behavior which makes me very concerned for the safety and well-being of my [daughter]."

The circuit court granted Father temporary sole custody of Daughter, pending a hearing on the merits of his emergency motion. On August 29, 2011, the parties appeared before the court for that hearing, where Father testified to the foregoing facts.[1] Mother moved for judgment at the close of Father's case, arguing in part that the court lacked emergency jurisdiction over the matter. The court rejected Mother's argument:

---

1. In the meantime, the charging authority in Florida had increased Mother's larceny charges from under $100.00 to over $100.00. For this new charge, she was again placed under arrest and then released.

[COUNSEL]: [T]here's been no indication of any emergency with [Daughter]. There's been no indication that there has been any harm to the child or an impending harm.

THE COURT: The Mother has been charged with a felony drug charge and you don't consider that an emergency or harm?

[COUNSEL]: Harm to the child? Not at this time, no sir.

THE COURT: No? I do.

Mother then took the stand and testified that on the night of her arrest, she had finished shopping and wanted to rent a movie from an automated kiosk at the store's entrance; in attempting to do so, she took her shopping cart past the checkout lines, which led to her being accused of shoplifting. Mother further testified that she had accidentally brought home a dead patient's hydrocodone from her work as a hospice nurse, and she had it in her purse only so that she could destroy it later that night, at work.

Father introduced a printout of a commercial website showing that Mother had been arrested twice before, once in 2008 and once in 2009. Mother testified that in 2009, Daughter had an accident in a store, and when Mother hastily left to change Daughter's clothes, she unintentionally carried out a pair of the store's underwear. Mother averred that the charges were dropped, and Father introduced no evidence of a conviction. Mother had earlier testified that this was her only prior arrest; when confronted with the computer printout showing an arrest in 2008, she stated that she did not remember that occurrence.

Mother testified that she was fired after her most recent arrest because company policy forbade possession of patients' drugs outside of the workplace; but Mother stated that she had found a better-paying job with a firm that will hire her as long as she is not convicted of drug trafficking. Mother introduced the results of random drug tests that had been conducted for her job—including one from two days after her arrest—none of which indicated the presence of narcotics.

Mother also testified that she had been denied communication with Daughter since her removal to Maryland.

In his closing argument, counsel for Father reviewed the evidence and argued that the court should temporarily grant sole physical and legal custody to Father:

[Father is] very concerned that either Ms. Kalman has a drug problem or something is going on in her life that is going to take a registered nurse, a person in a highly respected career and have them be arrested two, three times for petty theft and now a petty theft with unexplained prescriptions in her pocketbook.

Those factors gave Mr. Fuste a good faith basis to believe that his daughter was not being cared for in the best manner possible.

\* \* \*

[S]he's facing a very serious felony charge in Florida for prescription drug fraud. That can have negative consequences for her in a couple of critical ways as it affects [Daughter], as Your Honor knows, a felony, incarceration possible.

Also, even if she does a sentence, as Your Honor knows, many felonies get pled out to something less. If she ends up with a lesser charge and she's on probation she still very well could lose her, her medical license so that she still has real factors that are negatively impacting on her life.

\* \* \*

But what we are saying is Your Honor, at this stage we don't know what's going to happen with Ms. Kalman. She may prevail on all charges and might come back in and make an argument that she is the fittest parent in the room and that may well be the case, Your Honor. But at this present juncture, I don't think that she can say that she's in, on par with her ex-husband. She's got serious felony charges.

She runs the risk of everything that I just suggested, even in addition to the possible easy out of going to Switzer-

land which she's denied. It's a concern, Your Honor, but the primary concern is the best interest of the child. The best interest of [Daughter], we believe Your Honor in the short term, would be to leave her with her Father.

* * *

Ms. Kalman doesn't even have a trial date yet, she has an arraignment set for September. I was going to suggest that we come back in 90 days, Your Honor. We would ask that [Father] remain with custody, we can provide the Court with progress reports, give mom unlimited access in terms of skyping and telephone, things like that. If she wants to come up to Maryland, dad is fine with her exercising her visitation. I'm not going to say, you know, she needs to be supervised given her representations to the Court, but Your Honor, we think that what would be worse [is] for [Daughter] to go back to Florida.

Let's assume Your Honor doesn't feel that there's sufficient evidence at this stage and [Daughter] goes back to Florida, and then mom has a negative turn of events at the Florida courts, Your Honor. Or, even if she gets probation dates, take her license, that's going to cause Mom additional financial hardship and she's, what if she can't afford to take care of her daughter? That's going to be more stressful for [Daughter] to go back to Florida and then possibly have to come back up here and dad kind of pull [Daughter] out of the fire so to speak.

Counsel for Mother again argued that the court should grant judgment for lack of emergency jurisdiction and proffered that Mother would pursue the matter in Florida on her own accord:

My client has indicated that she will ask the State of Florida[,] which is the child's proper home state[,] to become involved and to solidify the custody order down there. She'll be asking for legal as well as physical custody. And Florida is also the appropriate place for Mr. Fuste to be asking for custody. The emergency will arise out of a

conviction. If an arrest is grounds for a change in custody, that is for the State of Florida to decide.

The court stated its ruling on the record, finding that Mother's explanation of her arrests were not credible and that the court had jurisdiction over the parties' custody dispute:

> This Court had jurisdiction, continues to have jurisdiction of those matters. That's the reason why a petition as to modify were filed including your client, Ms. Kosak. And there is not an existing case in Florida, there has been and continues to be an existing case in the State of Maryland.
>
> So one, this Court finds that it has jurisdiction in light of that, and secondly, I do find this to be an emergency situation because of the circumstances that clearly this child would be subjected to abuse under certain circumstances that could occur and have already occurred in this case. But for the fact that she had the defendant's parents that were available to her she would have been in jail.[2]

Mother subsequently noted this appeal, and at argument the parties informed us that proceedings in Florida have been initiated and are stayed pending resolution of the instant action.

## DISCUSSION

### I. Continuing, Exclusive Jurisdiction

Jurisdiction over child custody matters is governed by the Maryland Uniform Child Custody Jurisdiction and Enforcement Act ("the Act"), Maryland Code (1984, 2006 Repl.Vol.), §§ 9.5–101 to 9.5–318 of the Family Law Article ("FL").[3] The existing custody order in this case was issued by a Maryland court and was consistent with the Act; thus, Family Law

---

2. The trial judge also noted, later in his ruling, that the parties' ongoing divorce litigation had come before him on various dockets, "petitions for modification, this Court having subject matter jurisdiction to hear those cases."

3. For an explanation of the Act, its history and its adoption in Maryland, see *Toland v. Futagi*, 425 Md. 365, 370–77, 40 A.3d 1051 (2012).

§ 9.5–202(a)(1) governs and provides that the circuit court has "exclusive, continuing jurisdiction" over the determination of Daughter's custody *"until a court of this State determines* that neither the child, the child and one parent, nor the child and a person acting as a parent have a significant connection with this State and that substantial evidence is no longer available in this State concerning the child's care, protection, training, and personal relationships[.]"[4] (Emphasis added.) *See also* Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") § 201 cmt. (Draft 1997) ("[E]ven if the child has acquired a new home State, the original decree State retains exclusive, continuing jurisdiction, so long as the general requisites of the "substantial connection" jurisdiction provisions of Section 201 are met. If the relationship between the child and the person remaining in the State with exclusive, continuing jurisdiction becomes so attenuated that the court could no longer find significant connections and substantial evidence, jurisdiction would no longer exist.").[5]

---

**4.** Alternatively, FL § 9.5–202(a)(2) terminates continuing jurisdiction if "a court of this State or a court of another state determines that the child, the child's parents, and any person acting as a parent do not presently reside in this State." Father's residence in Maryland is not disputed, so we need not address this subsection.

**5.** We note that the UCCJEA introduces some jurisdictional confusion by making positive assertions as to when "subject matter jurisdiction" does (or does not) exist based only on the UCCJEA, itself. But there are factors in the law outside the UCCJEA that can deprive a court of subject matter jurisdiction. For example, FL § 1–201 sets forth Maryland equity courts' jurisdiction over various family matters and, in so doing, places conditions on the existence of subject matter jurisdiction, such as the requirement that a custody case concern a "child." *See Early v. Early*, 338 Md. 639, 654, 659 A.2d 1334 (1995) (FL § 1–201 confers subject matter jurisdiction over specified cases). Thus, it would be more appropriate to couch the UCCJEA's provisions in terms that explain that they all are *necessary* elements—rather than *sufficient* conditions—of subject matter jurisdiction.

In a similar vein, the Supreme Court of Washington noted that the UCCJEA "might have more accurately used the term 'exclusive venue' instead of 'subject matter jurisdiction.'" *In re Custody of A.C.*, 165 Wash.2d 568, 573 n. 3, 200 P.3d 689 (Wash.2009). We agree with that general sentiment, except that UCCJEA drafters intended to co-opt certain universal rules of subject matter jurisdiction from bodies of law

■ Mother argued before the circuit court that Daughter had resided in Florida since her birth and that Daughter's only connection to Maryland was her *father's* residence and the one week of her life which she spent here, and that substantial evidence was not available to the court.[6] Rather than ruling on whether it did or did not have the required "significant connections" or "substantial evidence" to exercise continuing jurisdiction,[7] the circuit court presumed that it had continuing, exclusive jurisdiction over the custody dispute because Maryland was the decree state and the parties continued to litigate their divorce and its related matters in Maryland.[8] This, however, was an error of law.

outside UCCJEA, such as the condition that parties cannot confer subject matter jurisdiction on the courts by consent. *See* UCCJEA § 201 cmt. ("It should also be noted that since jurisdiction to make a child custody determination is subject matter jurisdiction, an agreement of the parties to confer jurisdiction on a court that would not otherwise have jurisdiction under this Act is ineffective."). It would therefore seem unwise to excise all references to "subject matter jurisdiction" from the UCCJEA.

6. Father argued before the trial court and this Court that Maryland is Daughter's "home state," but he appears to be unaware of that term's relevant statutory definition, in FL § 9.5–101(h)(1), as "the state in which a child lived with a parent or a person acting as a parent for at least 6 consecutive months, including any temporary absence, immediately before the commencement of a child custody proceeding[.]"

Moreover, "home state" jurisdiction is not controlling in this case because it is subordinate to continuing, exclusive jurisdiction. By the terms of FL § 9.5–201(a), "home state" jurisdiction ordinarily applies to initial child custody determinations, and it arises in cases with an existing decree *only if* the decree state lacks continuing jurisdiction under FL § 9.5–202. *See* FL § 9.5–202(b) ("A court of this State that has made a child custody determination and does not have exclusive, continuing jurisdiction under this section may modify that determination only if it has jurisdiction to make an initial determination under § 9.5–201 of this subtitle.").

7. The one week that Daughter spent in Maryland before these events is undoubtedly insignificant. *See Olson v. Olson,* 64 Md.App. 154, 166, 494 A.2d 737 (1985) (visiting another state for four consecutive weeks each summer does not constitute a significant connection). The record does not reveal, however, whether the requisite substantial evidence existed in Maryland.

8. The trial court's decision would have been correct under the original rule of continuing jurisdiction in Maryland, but that was abrogated with

Under the Act, parties cannot confer jurisdiction upon the court by consent. UCCJEA § 201 cmt. ("[A]n agreement of the parties to confer jurisdiction on a court that would not otherwise have jurisdiction under this Act is ineffective."); *M.B.L. v. G.G.L.*, 1 So.3d 1048, 1051 (Ala.Civ.App.2008); *Stauffer v. Temperle*, 794 N.W.2d 317, 322 (Iowa App.2010); *Friedman v. Eighth Judicial Dist. Court of Nev.*, 264 P.3d 1161, 1167 (Nev.2011); *Kelly v. Kelly*, 806 N.W.2d 133, 138–39 (N.D.2011); *In re Parentage of Ruff*, 168 Wash.App. 109, 118, 275 P.3d 1175 (Wash.App.2012). Further, to hold that ongoing custody proceedings *themselves* create a "significant connection" satisfactory of § 9.5–202(a)(1) would introduce a circular definition of jurisdiction and defeat the principles embodied in the law by its drafters, the National Conference of Commissioners on Uniform State Laws, whose comments inform us that the Act should be interpreted so as to:

(1) Avoid jurisdictional competition and conflict with courts of other States in matters of child custody which have in the past resulted in the shifting of children from State to State with harmful effects on their well-being;

(2) Promote cooperation with the courts of other States to the end that a custody decree is rendered in that State which can best decide the case in the interest of the child;

(3) Discourage the use of the interstate system for continuing controversies over child custody;

(4) Deter abductions of children;

(5) Avoid relitigation of custody decisions of other States in this State;

(6) Facilitate the enforcement of custody decrees of other States;

---

the enactment of the Uniform Child Custody Jurisdiction Act ("UCCJA")—the predecessor of the current Act—in 1975. *Olson v. Olson*, 64 Md.App. 154, 167–68, 494 A.2d 737 (1985) (citing *Berlin v. Berlin*, 239 Md. 52, 56–57, 210 A.2d 380 (1965); *Howard v. Gish*, 36 Md.App. 446, 373 A.2d 1280 (1977)).

UCCJEA § 101 cmt. (1997); *Paltrow v. Paltrow,* 283 Md. 291, 293, 388 A.2d 547 (1978).[9] Finally, FL § 9.5–202(a)(1) grants Maryland continuing, exclusive jurisdiction over the dispute *until* the circuit court determines that this state lacks significant connections or substantial evidence. It is not the intent of the Act, however, to postpone those determinations and thereby extend continuing jurisdiction indefinitely, for this also would defeat the Act's purposes.

Although the circuit court retained continuing, exclusive jurisdiction over Daughter's custody *until* it found that the requisites of FL § 9.5–202(a) were *not* satisfied by the facts of the case, the court erred when it *presumed* that it retained jurisdiction simply because of the parties' history of litigation in Maryland. This error would have been rendered harmless if the circuit court had other grounds for jurisdiction, but as we now explain, it did not.

## II. Temporary Emergency Jurisdiction

Having failed to determine whether Maryland passed the "significant connection" or "substantial evidence" tests of FL § 9.5–202(a)(1), the trial court's judgment could yet be upheld if it correctly ruled that it had temporary emergency jurisdiction under the Act. For the reasons that follow, we hold that it did not, and we therefore remand the case for further proceedings.

Section 9.5–204(a) of the Act grants a Maryland court "temporary emergency jurisdiction if the child is present in this State and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened

---

9. These purposes were explicit in the text of the UCCJEA's predecessor, the UCCJA. *See Paltrow,* 283 Md. at 293, 388 A.2d 547. They now appear only in the comments accompanying § 101 of the UCCJEA, whose text was enacted in Maryland as FL § 9.5–318, without the accompanying comments. The present comments to UCCJEA § 101 explain that although these principles were extensively cited by courts during the UCCJA era, they were eliminated from the text of the UCCJEA "because Uniform Acts no longer contain such a section."

with mistreatment or abuse." Admittedly, our cases do not provide much guidance on what constitutes an "emergency." Sometimes circumstances that appear to rise to an emergency situation in one judge's judgment will not even gain a hearing before another court. But where the circuit court has entered a child custody order either by agreement of the parents or following an evidentiary hearing, it should not be subject to sudden modification based solely on the subjective judgment of another judge that an emergency justifies it, without some requisite fact finding.

 Our question, then, is whether the facts of this case constitute actual or threatened "mistreatment or abuse" under FL § 9.5–204(a). This is a matter of statutory interpretation, which we address with the following rubric:

> [T]he paramount rule of statutory construction is to ascertain and effectuate the intent of the legislature. The starting point in the first instance is the plain language of the statute. We view the words of a statute in ordinary terms, in their natural meaning, in the manner in which they are most commonly understood. If the words of a statute are clear and unambiguous, our inquiry ordinarily ends and we need investigate no further, but simply apply the statute as it reads. We neither add nor delete words to an unambiguous statute in an attempt to extend the statute's meaning. We interpret statutes to give every word effect, avoiding constructions that render any portion of the language superfluous or redundant.

*Gillespie v. State*, 370 Md. 219, 221–22, 804 A.2d 426 (2002) (internal citations and quotation marks omitted). "If ... the meaning of the plain language is ambiguous or unclear, we seek to discern legislative intent from surrounding circumstances, such as legislative history, prior case law, and the purposes on which the statutory framework was based." *Lewis v. State*, 348 Md. 648, 653, 705 A.2d 1128 (1998). Further, when the statute to be interpreted is part of a statutory scheme, we read it in context, together with the other statutes on the same subject, harmonizing them to the extent possible.

*Mid–Atlantic Power Supply Ass'n v. Pub. Serv. Comm'n,* 361 Md. 196, 204, 760 A.2d 1087 (2000). Finally, we are guided by the model law's drafters, whose general admonitions are set forth, above, and reiterated here because of their importance to the present question:

(1) Avoid jurisdictional competition and conflict with courts of other States in matters of child custody which have in the past resulted in the shifting of children from State to State with harmful effects on their well-being;

(2) Promote cooperation with the courts of other States to the end that a custody decree is rendered in that State which can best decide the case in the interest of the child;

(3) Discourage the use of the interstate system for continuing controversies over child custody;

(4) Deter abductions of children;

(5) Avoid relitigation of custody decisions of other States in this State;

(6) Facilitate the enforcement of custody decrees of other States;

UCCJEA § 101 cmt.; *Paltrow,* 283 Md. at 293, 388 A.2d 547.

### A. *"Abuse" under FL § 9.5–204(a)*

The first sufficient condition of temporary emergency jurisdiction under FL § 9.5–204(a) is satisfied where the child, or a sibling or parent of the child, is subjected to or threatened with "abuse." We agree with appellant that "abuse" as used in FL § 9.5–204(a) should be reconciled with existing statutory definitions of that word. *See Mid–Atlantic Power Supply Ass'n,* 361 Md. at 204, 760 A.2d 1087. Thus, we take note that Title Four of the Family Law Article authorizes protective orders for victims of domestic violence and defines "abuse" as "any of the following acts:"

(i) an act that causes *serious bodily harm;*

(ii) an act that places a person eligible for relief in *fear of imminent serious bodily harm;*

(iii) *assault in any degree;*

(iv) *rape or sexual offense* under §§ 3–303 through 3–308 of the Criminal Law Article or attempted rape or sexual offense in any degree;

(v) false imprisonment; or

(vi) stalking under § 3–802 of the Criminal Law Article.

FL § 4–501(a)(1) (emphases added). *See also Kaufman v. Motley*, 119 Md.App. 623, 705 A.2d 330 (1998) (standard in the context of the domestic violence statute for an "emergency" change in child custody is proof by clear and convincing evidence that the children are placed in fear of imminent bodily harm). Elsewhere, Title Five of the Family Law Article, which provides for centralized reporting of child abuse and neglect, defines "abuse" as:

(1) the *physical or mental injury* of a child by any parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member, *under circumstances that indicate that the child's health or welfare is harmed or at substantial risk of being harmed;* or

(2) *sexual abuse* of a child, whether physical injuries are sustained or not.

Family Law § 5–701(b) (emphases added). Finally, § 3–601(a)(2) of the Criminal Law Article (2002, 2012 Repl.Vol.) defines "abuse" in the same vein: *"physical injury* sustained by a minor as a result of cruel or inhumane treatment or as a result of a malicious act under *circumstances that indicate that the minor's health or welfare is harmed or threatened by the treatment or act."* (Emphasis added.)

A simple reading of these definitions reveals their common factor: *actual physical or mental harm or injury, or a substantial risk thereof.* We therefore agree with appellant that "abuse" under FL § 9.5–204(a) requires some actual injury or substantially probable threat to the victim's physical or mental welfare.[10]

---

**10.** We say "victim" because FL § 9.5–204(a) contemplates abuse or mistreatment of a child or "a sibling or parent of the child."

### B. "Mistreatment" under FL § 9.5–204(a)

The second sufficient condition of temporary emergency jurisdiction under FL § 9.5–204(a) is satisfied where the child, or a sibling or parent of the child, is subjected to or threatened with "mistreatment." Our present task is to determine the meaning of this word in light of the rules of statutory interpretation, set forth above. And while we note that the uniform drafters' word choices are important, we must account for both the plain meaning of "mistreatment" and the specific meanings imparted by the various laws of this state. As to the former, "mistreatment" is commonly held to be a synonym of "abuse," [11] and as to the latter, what is now criminal "abuse" in Maryland was previously labeled "mistreatment" by criminal law statutes, *Bowers v. State*, 283 Md. 115, 118, 389 A.2d 341 (1978) (discussing the history of child abuse legislation in Maryland). Thus, both the plain meaning of "mistreatment" and the relevant history of this word in Maryland statutes equate it with "abuse" and imply that FL § 9.5–204(a) contains a redundancy, which the law abhors. But we can both eliminate this redundancy and reconcile the Act with Maryland statutes and case law if we read "mistreatment" as a proxy for "neglect," as defined by Maryland law.

The drafters of the UCCJEA purposefully excluded "neglect" as a basis for emergency jurisdiction in replacing its predecessor, thereby indicating a heightened standard for use in emergency custody determinations. They did so ostensibly because "[n]eglect is so elastic a concept that it could justify taking emergency jurisdiction in a wide variety of cases." UCCJEA § 204 cmt. We are skeptical of this reasoning, for we doubt that the plain meaning of "mistreatment" is any less

---

11. *See, e.g.,* "Mistreated," Princeton University WordNet, http://wordnetweb.princeton.edu/perl/webwn?s=mistreated (last visited July 19, 2012) ("abused, ill-treated, maltreated, mistreated (subjected to cruel treatment) 'an abused wife' "); "Mistreat," Merriam–Webster.com, http://www.m-w.com/dictionary/mistreat (last visited July 19, 2012) ("Synonyms: brutalize, bully, ill-treat, ill-use, kick around, maltreat, manhandle, mess over [slang], mishandle, abuse, misuse"); "Mistreat," Dictionary.com, http://dictionary.com/browse/mistreat. (last visited July 19, 2012) ("to treat badly or abusively").

"elastic" than "neglect." Regardless of our doubts, we need not concern ourselves with "elasticity"—be it relative or absolute—because the Maryland Code consistently and explicitly defines "neglect" as a *complement* to "abuse." First, Family Law § 5–701 provides:

> (s) *Neglect.*—"Neglect" means the *leaving of a child unattended or other failure to give proper care and attention* to a child by any parent or other person who has permanent or temporary care or custody or responsibility for supervision of the child under circumstances that indicate:
>
> (1) that *the child's health or welfare is harmed or placed at substantial risk of harm;* or
>
> (2) *mental injury to the child or a substantial risk of mental injury.*

(Emphases added). Second, Criminal Law § 3–602.1(a)(5) states:

> (5)(i) "Neglect" means the *intentional failure to provide necessary assistance and resources* for the physical needs or mental health of a minor that *creates a substantial risk of harm to the minor's physical health or a substantial risk of mental injury to the minor.*
>
> (ii) "Neglect" does not include the failure to provide necessary assistance and resources for the physical needs or mental health of a minor when the failure is due solely to a lack of financial resources or homelessness.

(Emphases added). Thus, in both the family law and criminal law contexts, the terms "abuse" and "neglect" require *at least a substantial risk of mental or physical injury.* The difference between the two is that the actual or potential mental or physical injury must be the result of some *positive action* to constitute abuse, while "neglect" accounts for actual or potential injuries resulting from some *failure to act.*

Because the uniform drafters' intent was to grant jurisdiction to a state lacking significant connections or "home state" status only under "extraordinary circumstances," UCCJEA § 204 cmt., and because the Act can be reconciled with

Maryland law only by equating "mistreatment" and "neglect," we conclude that both "abuse" and "mistreatment" under FL § 9.5–204(a) require at least a substantial risk of physical or mental harm or injury.[12] Therefore, a court cannot exercise temporary emergency jurisdiction under FL § 9.5–204(a) unless there is evidence of actual physical or mental harm or injury, or a substantial risk of physical or mental harm or injury.

*C. Temporary Emergency Jurisdiction in the Present Case*

 Turning to the record, we agree with Mother that the evidence does not rise to such a level as to establish actual or threatened "mistreatment or abuse." The record lacks any positive assertion of physical or mental injury, and there was no evidence or finding that Daughter faced a "substantial risk" of harm from either abuse or neglect as defined above. Other than Father's general concern for his daughter's "safety" expressed in his complaint and affidavit, the word does not appear anywhere else in the record, nor do the words "harm," "injury," "violence," *et cetera.* Instead, the motions and hearing transcript leave the indelible impression that Father's fears were contingent on Mother's conviction and potential loss of freedom and income, none of which had occurred (and

---

12. We therefore join the ranks of several state courts that hold similar interpretations of the UCCJEA and its predecessor, the UCCJA. *See, e.g., Ex parte J.R.W.,* 667 So.2d 74, 80 (Ala.1994) (emergency authority under the UCCJEA's federal analogue, the Parental Kidnapping Prevention Act of 1980, 28 U.S.C.S. § 1738A(c)(2)(C), is limited to "temporary modifications necessary to protect the child from substantial and imminent harm"); *Devine v. Martens,* 371 Ark. 60, 69, 263 S.W.3d 515 (Ark.2007) ("[T]he issue of whether an emergency exists hinges upon whether there is an immediate danger to the life or health of the child, including actual or threatened mistreatment or abuse."); *In re Nada R.,* 89 Cal.App.4th 1166, 1174, 108 Cal.Rptr.2d 493 (Cal.App.4th Dist.2001) ("The courts have interpreted 'emergency' as a situation in which a child is in immediate risk of danger if returned to a parent's care"); *In re Marriage of Anderson,* 25 Kan.App.2d 754, 758, 969 P.2d 913 (Kan. Ct.App.1998) (an emergency under the UCCJEA exists "when a child is in immediate danger from a source within the state's borders"); *Schoeberlein v. Rohlfing,* 383 N.W.2d 386, 389 (Minn.Ct.App.1986) (emergency jurisdiction requires "present danger").

none of which could occur for at least the next ninety days).[13] It is clear that Father did not believe that Mother herself posed a threat to Daughter, for he conceded that Mother should be allowed to exercise unsupervised visitation. Nor did Father express any specific danger from Daughter's environment in Florida; Father's closing argument conveyed only generalized concerns that Daughter "was not being cared for in the best manner possible," "that [Mother] still has real factors that are negatively impacting on her life," that Mother is not "on par with her ex-husband," and that if Mother is convicted she may not be able to afford to take care of her daughter, and her relocation to Maryland would be "more stressful" than if she remained in Maryland until the matters in Florida are resolved. None of these statements demonstrate or express the sort of immediate danger inherent in the words "abuse" or "mistreatment." Consequently, the facts adduced here fell woefully short of an emergency.

We recognize that the trial court was faced with a difficult choice. Mother's testimony was not credible to the trial judge and undoubtedly raised concerns for him about Daughter' immediate care and safety. Acting in what he termed "the child's best interests,"[14] he granted the Father's emergency

---

13. Father also feared that Mother would flee to Switzerland, but Father has not argued this point on appeal, and there is no indication that flight *alone* is a risk or harm contemplated by FL § 9.5–204.

14. Although the "best interests" of a child are relevant to jurisdictional inquiries under the UCCJEA, they are not the controlling standard. As the UCCJEA drafters explain in their prefatory note:

> **5. Role of "Best Interests."** The jurisdictional scheme of the UCCJA was designed to promote the best interests of the children whose custody was at issue by discouraging parental abduction and providing that, in general, the State with the closest connections to, and the most evidence regarding, a child should decide that child's custody. The "best interest" language in the jurisdictional sections of the UCCJA was not intended to be an invitation to address the merits of the custody dispute in the jurisdictional determination or to otherwise provide that "best interests" considerations should override jurisdictional determinations or provide an additional jurisdictional basis.

motion and set the case for status review in approximately ninety days.[15]

What is clear from the record is that it was the uncertainty of the Mother's situation which caused the trial court to grant the emergency motion. But uncertainty is a far cry from imminent harm or abuse or mistreatment, and there was no evidence of abandonment here. Father's concerns for his daughter's care and safety, albeit legitimate, did not constitute an emergency, particularly because the Mother's criminal case was not even scheduled for trial yet. Daughter had grandparent support in Florida and very limited experience living with her Father in Maryland. There was no need for emergency intervention here to protect Daughter from her Mother. The trial court's findings, under the circumstances presented, were clearly erroneous and its Temporary Custody Order of September 2, 2011, was entered in error.

For the foregoing reasons, we vacate the judgment and remand for further proceedings so that the circuit court may proceed under FL § 9.5–202 to determine whether it *can* exercise jurisdiction over this case and, after conferring with the Florida court, whether it *should* exercise jurisdiction. *See* FL § 9.5–109 (authorizing communication between courts); FL § 9.5–207 ("A court of this State that has jurisdiction under this title to make a child custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum."); UCCJEA § 110 cmt. (communication between courts is strongly suggested in applying UCCJEA section enacted as FL § 9.5–207).

---

The UCCJEA eliminates the term "best interests" in order to clearly distinguish between the jurisdictional standards and the substantive standards relating to custody and visitation of children.
*See also Garg v. Garg*, 393 Md. 225, 239–40 n. 7, 900 A.2d 739 (2006).

**15.** The record indicates that the judge thought the parents should resolve the custody dispute before November 30th.

JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.