*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 19-FS-1057 & 19-FS-1058

IN RE J.W.
AND
IN RE JA.W.;

A.W., APPELLANT.

Appeals from the Superior Court
of the District of Columbia
(NEG-386-18 & NEG-387-18)

(Hon. Elizabeth Carroll Wingo, Trial Judge)
(Hon. Julie Breslow, Magistrate Judge)

(Argued June 17, 2021      Decided November 10, 2021)

*Judith del Cuadro-Zimmerman* for appellant.

*David Stark*, Assistant Attorney General, with whom *Karl Racine*, Attorney General, *Loren L. Alikhan*, Solicitor General, *Caroline S. Van Zile*, Principal Deputy Solicitor General, and *Stacy L. Anderson*, Senior Assistant Attorney General, were on the brief, for appellee.

Before GLICKMAN and DEAHL, *Associate Judges*, and BECKER, *Associate Judge*, Superior Court of the District of Columbia.\*

---

\* Sitting by designation pursuant to D.C. Code § 11-707(a) (2012 Repl.).

GLICKMAN, *Associate Judge*:  The Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA)[1] "establishes the bases for subject matter jurisdiction over [child] custody matters in the District, setting forth rules . . . [for] when more than one state may be involved, in order to prevent jurisdictional conflicts."[2]  The provision of the UCCJEA at issue in this appeal grants a court in the District temporary emergency jurisdiction over a child who is present here when "it is necessary in an emergency to protect the child because the child . . . is subjected to or threatened with mistreatment or abuse."[3]

Appellant A.W. challenges the Superior Court's exercise of this temporary emergency jurisdiction to adjudicate her two minor children as neglected under D.C. Code §§ 16-2301 (9)(A)(ii) and (iii).  Appellant also challenges the sufficiency of the evidence underlying the findings of neglect.  For the following reasons, we affirm the exercise of jurisdiction and the neglect rulings.

---

[1]  D.C. Code §§ 16-4601.01 to -4605.03 (2012 Repl.).

[2]  *In re J.R.*, 33 A.3d 397, 400 (D.C. 2011).

[3]  D.C. Code § 16-4602.04(a).

**I.**

**A. Removal of J.W. and Ja.W.**

Appellant is the biological mother of J.W. and Ja.W., who were born on December 9, 2009, and March 8, 2008, respectively. On October 4, 2018, appellant arrived in the District with her children. The family initially stayed at a domestic violence shelter but left after approximately one week. Appellant then approached the Virginia Williams Family Resource Center (VWFRC),[4] where she was offered a free housing placement. Appellant rejected the offer due to her concern that the housing was unsafe. She chose instead to reside with her children in Union Station.

On the evening of November 18, 2018, Amtrak police officer Adrian Little spoke with appellant after observing that she and her children were in Union Station after closing time without tickets. Appellant told Sergeant Little that they had been living in the station, and that she had family members who were trying to kill her for her life insurance policy. After conferring with some of his colleagues, Sergeant Little decided to call the Child and Family Services Agency (CFSA) hotline.

---

[4] VWFRC is the District's main intake facility for families experiencing homelessness or who are at risk of homelessness.

CFSA sent licensed social worker and Child Protective Services investigator Lane Cyphers to assess appellant's condition. Appellant told Mr. Cyphers that she and the children had been living in Union Station for about a month, and that she had refused the offer of shelter from VWFRC due to safety concerns. Appellant said she had traveled to the District looking for work after being ejected from her home in Georgia, that an unidentified woman had been stalking her, and that the children's father, J.F., was trying to kill her. When Mr. Cyphers asked about the children's education, appellant claimed they were being homeschooled, but she was unable to produce any academic materials other than two books and a worksheet. Appellant also gave Mr. Cyphers false names for J.W. and Ja.W.

Based on this interaction with appellant, Mr. Cyphers was worried about her "mental health," and after meeting with the children he was concerned that "some of her apparent delusions were now interfering with their mental health as well." Mr. Cyphers therefore requested a mobile crisis unit, so "that there would be some mental health professionals there on scene to help [appellant] if she needed support." The mobile crisis unit eventually concluded that appellant "was not a harm to herself, or her children, but that she had delusional thinking." Mr. Cyphers then decided the best course of action was to commence a neglect proceeding and immediately remove J.W. and Ja.W. to foster care.

The neglect petitions, filed and served on appellant on November 20, 2018, alleged that J.W. and Ja. W. were neglected within the meaning of D.C. Code §§ 16-2301(9)(A)(ii) and (iii).  Section 16-2301(9)(A)(ii) provides that a child is neglected if the child is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for [the child's] physical, mental, or emotional health," and the deprivation is not due to a parent's "lack of financial means."  Section 16-2301(9)(A)(iii) provides that a child is neglected if their "parent . . . is unable to discharge his or her responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity."  In brief, the District alleged that appellant failed to provide the children with proper shelter and education, and that her mental health issues adversely affected the children's well-being.

**B. Probable Cause Hearing**

A probable cause hearing was held on the neglect petitions.  Appellant participated in the hearing, at which she confirmed J.W. and Ja.W.'s birthdates and the identity of their father.  Appellant testified that she was self-employed as a Christian motivational speaker, that she had made $800 the previous month, and that she had not yet applied for food stamps or medical benefits in the District.  The

magistrate judge also heard from Mr. Cyphers, who recounted his interaction with appellant at Union Station. Mr. Cyphers testified that he decided to remove J.W. and Ja.W. because he "felt that the mom's mental health was keeping her children from being in a safe environment."

The magistrate judge found probable cause to believe the children were neglected and ruled that they should remain in the foster care system with supervised visitation from appellant. The magistrate judge also ordered appellant to undergo a mental health evaluation, emphasizing the importance of her cooperation.

### C. Neglect Trial

On February 27, 2019, the magistrate judge held a one-day bench trial. Appellant did not attend the trial, and she had not complied with the order for a mental health examination. At the start of the trial, appellant's counsel objected to the court's subject-matter jurisdiction. Counsel asserted that because the District was not J.W. and Ja.W.'s home state, its courts could only "take emergency jurisdiction for 90 days." The magistrate judge rejected this argument when counsel was unable to cite any statutory authority for the purported ninety-day limit. Appellant's counsel then asserted that the magistrate judge had an affirmative obligation to contact the courts of Georgia, J.W. and Ja.W.'s home state, to

determine whether they wanted to assert jurisdiction over the case. The magistrate judge also rejected this assertion.[5]

The District called six witnesses to prove that appellant's children were neglected within the meaning of D.C. Code §§ 16-2301(9)(A)(ii) and (iii). In addition to its witnesses, the District introduced a list of twenty-nine requested admissions it had served on appellant, which she had failed to deny or answer in any way. Appellant's counsel presented no evidence.

The District's first two witnesses at trial were Sergeant Little and Mr. Cyphers. Sergeant Little said he first spoke with appellant and her children during a random seating check in Union Station between 11:00 and 11:30 p.m. (before that, he recalled seeing the family "off and on intermittently" during his shifts "for at least about a week."). When Sergeant Little asked appellant why neither she nor the children had train tickets, appellant responded "that they were homeless; she didn't have anywhere to go." Appellant then informed Sergeant Little that she could not call anyone for help because "there was people that were after her, and wanted to harm her." Appellant further stated to Sergeant Little that "she had been staying at

---

[5] *Cf.* D.C. Code § 16-4602.04(b)-(d).

several shelters, and they were unsafe." Sergeant Little decided to call the CFSA hotline to report the situation.

As he had during the probable cause hearing, Mr. Cyphers testified that CFSA sent him to Union Station to investigate appellant's situation. Upon arriving, Mr. Cyphers saw appellant alongside "the two kids [who] were . . . sleeping next to each other on a wooden bench." When Mr. Cyphers questioned her, appellant told him that "she was in Union Station for about a month," having been "ejected" from her previous apartment in Georgia. Appellant also said she had refused a shelter placement from VWFRC because "she didn't feel safe," and repeated to Mr. Cyphers her belief that various individuals were following her and trying to kill her. This left Mr. Cyphers with the impression that appellant "wasn't homeless because of her financial situation; she was homeless because she was actually denying shelter." Mr. Cyphers shared this conclusion with his CFSA supervisor, who agreed that appellant's children should be removed to foster care.

The District's third witness was Ms. Stephanie Thomas, the homeschooling coordinator for the District. Ms. Thomas confirmed that J.W. and Ja.W. were not registered to be homeschooled with the Office of the State Superintendent of Education, as was required by law.

The District's other three witnesses were Terri Buchinski, the social worker who supervised appellant's weekly visits and phone calls with the children following their removal, and Angela White and Dr. Rashida Clegg, the children's clinical therapists.

Ms. Buchinski had a Master's degree in social work, was licensed in the District of Columbia, and had worked as a CFSA social worker for three years. In satisfaction of her licensing requirements, she testified, she had taken courses on recognizing and diagnosing signs and symptoms of mental illness and been trained to make observations about mental illness and complete referrals for mental health services.

Ms. Buchinski testified about appellant's often troubling conduct during her visits with her children and other disturbing behavior. In most of the visits, appellant quizzed the children about their personal safety, whether anyone was trying to hurt them, touched them inappropriately, or made them feel unsafe at school or in the foster home. Appellant sent daily emails to Ms. Buchinski, other CFSA staff, school personnel, and attorneys, insisting her children were being held hostage and emotionally and sexually abused, and demanding their release. On one occasion,

appellant accused Ms. Buchinski of having a sexual relationship with the children's father and emotionally abusing her and the children.

The children's father, J.F., lived in Georgia, and Ms. Buchinski arranged for him to come to the District and see the children. Ja.W. had not seen his father in eight years and his sister had never met him. In December, Ms. Buchinski supervised J.F.'s first in-person visit, which went well. Appellant, however, told Ms. Buchinski that she feared the man who visited her children was an imposter and urged her to check his identification and look for a scar on his arm to confirm his identity. To determine whether they had met with the "correct" J.F., appellant also presented Ja.W. and J.W. with a photo array and asked them to select the photo that depicted the man they met.

Ms. Buchinski also testified to incidents in which appellant instigated and engaged in altercations with others in view of the children during her supervised visits. One such incident took place when appellant arrived at CFSA on the afternoon of January 9, 2019. Ms. Buchinski brought the children to the lobby to greet her. As appellant passed through security, a guard asked her to empty one of her bags for inspection. In view of the children, appellant refused to comply, became irate, and accused the guard of conducting an unlawful search. The standoff lasted

for several minutes. Ultimately, appellant did not pass through security and Ms. Buchinski supervised a shortened visit between appellant and her children in the CFSA lobby. During that visit, appellant asked Ja.W. and J.W. many questions about their safety and told them they would be returning home to her soon.

The record shows that this incident was disturbing to appellant's children, particularly Ja.W. After the visit on January 9, Ja.W. told Ms. Buchinski he was frightened by his mother's refusal to empty her bag for the security guard and was worried she was hiding something in it. As a result, he said, he did not want to see appellant at the next scheduled visit the following week. When she arrived at CFSA for that visit on January 16 and was told Ja.W. would not be coming down to meet her because of his fear of what she might have in her bag, appellant became angry and demanded proof he was still alive. With J.W., Ms. Buchinski went upstairs and took a photograph there of the two children. She then returned to the lobby and showed it to appellant. Insisting Ja.W. was being held hostage, appellant demanded to speak to him. Ms. Buchinski called upstairs and got Ja.W. on the phone. Appellant asked him to come downstairs and he refused. Appellant then accused CFSA of kidnapping him and holding him hostage, and she called the police.[6]

---

[6] Ms. Buchinski described other strange behavior by appellant in connection with her children. During one visit, for example, appellant suspected that Ja.W. was ill. She told Ms. Buchinski that she tested this by drinking out of Ja.W.'s water cup,

Ms. Buchinski had made arrangements for appellant's court-ordered mental health evaluations, but appellant refused to attend them. However, in Ms. Buchinski's opinion, based on her own training as a clinical social worker and her first-hand observations, appellant exhibited "signs of delusions, or delusional thinking." Ms. Buchinski was very concerned that, due to her untreated mental impairments, appellant was subjecting her children to her paranoid beliefs and behavior, isolating them and depriving them of appropriate shelter and education, and causing the children to live in fear of being held hostage or kidnapped.

The magistrate judge found Ms. Buchinski to be a "very credible witness." Noting that she was a licensed clinical social worker who had "observed [appellant] on multiple occasions and receive[d] email communications from her on an almost daily basis," the magistrate judge "credit[ed] her observation that [appellant's] behaviors indicate that she is experiencing paranoia and delusions."

---

after which she developed a sore throat. Appellant demanded that Ms. Buchinski take both children to the hospital to determine whether they had strep throat. When Ms. Buchinski said the children did not need emergency treatment, appellant accused her of being drunk or on drugs and said a military oversight committee would step in to protect her children.

Ms. Buchinski's concerns about the adverse effects of appellant's mental issues were confirmed by the children's therapists. Ja.W. had been evaluated and was being seen in therapy by Angela White, a clinician at CFSA's Office of Wellbeing. The parties stipulated to her qualifications as an expert in social work and therapy for children and families, and the magistrate judge found her to be "a knowledgeable and credible witness." Ms. White diagnosed Ja.W. with an unspecified adjustment disorder. She testified that when she first began working with Ja.W., he was reluctant to trust people other than his mother and sister "for safety reasons . . . even family members." Ja.W. believed — based on appellant's statements — that the family often had to move locations because his father was "going to kill [his] mother." His mother taught him and his sister never to tell others their real names "for safety reasons." Ms. White testified that, for Ja.W., "[w]hat mom said was it . . . he really got all of his cues and his information from mom." As a result, she said, the children were "very isolated — there were no family members; the[re] were no family friends . . . there were no other influences on the family, or on the kids."

J.W.'s therapist was Dr. Rashida Clegg. The parties stipulated to her clinical expertise in the field of psychology focusing on children and families. Dr. Clegg diagnosed J.W. as having a stressor-related adjustment disorder with (unspecified)

trauma. She testified that J.W. suffered from "intrusive thoughts . . . related to her mother's statements that her father was tracking them . . . through phones, cell phones, and the internet."[7] Elaborating on this point, Dr. Clegg explained that J.W. was "uncommon" among children her age in that she "overidentifi[ed] with her mother's trauma." Dr. Clegg also stated that J.W. was experiencing "distorted cognition . . . about what is safe and unsafe. She believes that living in a homeless environment [at Union Station] is safe, or there's nothing wrong with it . . . ."

In her written decision, the magistrate judge stated that she "fully credit[ed]" Ms. White's and Dr. Clegg's expert testimony and conclusions regarding appellant's "delusional and disordered" thinking and its adverse impact on her children. She credited the District's other witnesses as well, and gave "great weight" to many of the requested admissions that appellant had effectively conceded by failing to answer them. These included admissions that appellant had been offered and refused free shelter housing for herself and her children through the Virginia Williams Family Resource Center, and that she was "working as a motivational speaker and . . . earned money sufficient to feed the children regularly prior to their removal" on

---

[7] At the start of her therapy, Dr. Clegg testified, J.W. was very fearful of her father, even though she had never met him. Appellant had told her, from an early age, that her father was trying to kill her, beginning when appellant was pregnant with her.

November 18, 2018. Other admissions to which the magistrate judge gave great weight included these:

14. It is a true and accurate statement that I told [J.W.] and [Ja.W.] that people are following me and the children in Washington, D.C.

15. It is a true and accurate statement that I told [J.W.] and [Ja.W.] that people are tracking my phone calls and use of the computer.

16. It is a true and accurate statement that I told [J.W.] that her father tried to kill her while I was pregnant with her.

\* \* \*

19. It is a true and accurate statement that I believe there are numerous family members and nonfamily members who follow me regularly.

\* \* \*

22. It is a true and accurate statement that at the time of removal, I provided the CPS Social Worker Lane Cyphers with false names for [Ja.W. and J.W.].

23. It is a true and accurate statement that I told my children that they were being kidnapped if the foster parent took them across state lines.

The magistrate judge found the District proved by a preponderance of the evidence that J.W. and Ja.W. were neglected children on each ground alleged in the petitions, because appellant (1) failed to provide them with appropriate shelter and education for reasons unrelated to her lack of financial means, and (2) was unable to discharge her responsibilities to her children because of her mental incapacity. The magistrate judge did not address the court's emergency jurisdiction in her decision.

## D. Motions for Dismissal and Review

Following the magistrate judge's decision, appellant filed a motion for review of the magistrate judge's order by an associate judge of the Superior Court. Appellant asserted that the evidence was insufficient to support the magistrate judge's findings of neglect under either section (9)(A)(ii) or (iii), because: (1) the record did not show that her failure to provide shelter for and educate the children was not due to her lack of financial means; (2) there was no evidence that she suffered from a "mental incapacity"; and (3) there was no nexus between her alleged mental incapacity and her ability to care for her children. Appellant also moved to dismiss the case for lack of temporary emergency jurisdiction under D.C. Code § 16-4602.04(a), on the new ground that J.W. and Ja.W. had not been "subjected to or threatened with mistreatment or abuse."[8]

The reviewing judge upheld the court's emergency jurisdiction, concluding that the children had been subjected to or threatened with "mistreatment" within the meaning of the UCCJEA. Acknowledging that the term "mistreatment" is not defined in the Uniform Act or other District law, the judge ruled that it "clearly

---

[8] D.C. Code § 16-4602.04(a).

encompasses the circumstances of these cases." The judge upheld the findings of neglect, too, satisfied that the evidence — in particular, the "credible and detailed testimony" from the family's social worker and the children's therapists — demonstrated the detrimental effects on J.W. and Ja.W. of appellant's "delusional, paranoid behavior," and that appellant's "disordered thinking regarding safety . . . caused her to reject free shelter housing in favor of living with the minor children for an extended period of time in a train station."

Appellant filed a timely appeal.

## II.

Although we examine the order of the associate judge affirming the conclusions of the magistrate judge, "our powers of appellate review are not so limited that, in reviewing the associate judge's final order we may not look to the findings and conclusions of the fact finder on which that ruling is based."[9] The District has the burden of proving by a preponderance of the evidence that a child is

---

[9] *In re S.L.G.*, 110 A.3d 1275, 1285 (D.C. 2015) (quoting *In re C.L.O.*, 41 A.3d 502, 510 (D.C. 2012)).

neglected.[10]  Our review of a sufficiency challenge "is deferential: '[t]his court will reverse a finding of neglect only if it is plainly wrong or without evidence to support it,' and only after viewing the evidence in the light most favorable to the court's ruling."[11]  Questions of statutory interpretation and jurisdiction, however, are legal issues that we review de novo.[12]

## A. Temporary Emergency Jurisdiction

The UCCJEA was published in 1997 and has been adopted by all fifty states and the District.  It governs state courts' jurisdiction to make or modify child custody orders and is applicable to child-custody proceedings "in which the legal custody, physical custody, or visitation with respect to a child is an issue," including neglect adjudications.[13]  As this court has previously summarized:

> Under the UCCJEA, the District has jurisdiction to enter
> an initial or new custody order [in] any of the following
> four circumstances:   the District is the child's home

---

[10]  *In re K.M.*, 75 A.3d 224, 230 (D.C. 2013).

[11]  *In re A.B.*, 999 A.2d 36, 44 (D.C. 2010) (quoting *In re L.H.*, 925 A.2d 579, 581 (D.C. 2007) (internal quotation marks omitted)).

[12]  *In re J.R.*, 33 A.3d at 400; *see also Heard v. Johnson*, 810 A.2d 871, 877 (D.C. 2002).

[13]  D.C. Code § 16-4601.01(4).

state,[14] the child has a significant connection to the District, the District is a more appropriate forum for the proceeding, or the District provides the child's last chance for relief. D.C. Code § 16-4602.01(a)(1)–(4) (2001).[15]

In addition, "a court of the District has temporary emergency jurisdiction if the child is present in the District and the child has been abandoned *or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child is subjected to or threatened with mistreatment* or abuse."[16] The UCCJEA does not define the term "mistreatment," and it is not used in any other part of the Act.

Both parties in this case agree that J.W. and Ja.W.'s "home state" at the time of removal was Georgia. They also agree that the non-emergency bases for jurisdiction under the UCCJEA were not satisfied, that the minor children were present in the District, and that appellant did not abandon them. Moreover, the District does not argue (and the associate judge did not find) that the children were subjected to or threatened with "abuse" within the meaning of the Act.

---

[14] The state in which the child lived with a parent or guardian for at least six months immediately before the commencement of the child custody proceeding. D.C. Code § 16-4601.01(8).

[15] *In re J.R.*, 33 A.3d at 400.

[16] D.C. Code § 16-4602.04(a) (emphasis added).

Thus, appellant's jurisdictional argument hinges entirely on the meaning of "mistreatment." Appellant contends the associate judge incorrectly conflated this term with the concept of neglect, when in fact "the drafters of the UCCJEA were clear that emergency jurisdiction should only be utilized in extraordinary situations." In other words, appellant argues that the standard for invoking temporary emergency jurisdiction under the UCCJEA based on mistreatment is higher than the District's standard(s) for neglect, and that the facts of this case do not rise to that level. The District responds that remedial statutes like the UCCJEA must be read broadly to accomplish their intended purpose, and that it presented "more than enough" evidence for the associate judge to "conclude that J.W. and Ja.W. were subjected to or threatened with mistreatment" by appellant.

Our first task, therefore, is to interpret "mistreatment" in light of the principles of statutory interpretation. "Statutory interpretation is a holistic endeavor, and, at a minimum, must account for the statute's full text, language as well as punctuation, structure, and subject matter."[17] Typically, "the intent of the lawmaker is to be found in the language . . . used. Thus, if the statute's or regulation's language is 'plain'

---

[17] *Hood v. United States*, 28 A.3d 553, 559 (D.C. 2011) (quoting *Cook v. Edgewood Mgmt. Corp.*, 825 A.2d 939, 946 (D.C. 2003) (internal quotation marks and citation omitted)).

and allows for no other meaning, we will generally look no further and give the words used the meaning ordinarily attributed to them."[18]  If, however, the statutory language is ambiguous, we may resort to legislative history or other extrinsic aids.[19] When dealing with a uniform act like the UCCJEA, we may also consult the drafters' official comments on the text.[20]

Applying the plain meaning rule alone creates an interpretive problem in this case — where emergency jurisdiction can be based on "mistreatment *or* abuse" — because the term "mistreatment" is commonly used as a synonym for abuse.[21] Reading the two words as synonymous here would render the word "abuse" in § 16-4602.04(a) unnecessary, contrary to "the basic principle . . . that a court must give effect to all the provisions of [a statute], so that no part of it will be either redundant

---

[18] *Whitfield v. United States*, 99 A.3d 650, 656 (D.C. 2014) (internal citations and quotation marks omitted).

[19] *See, e.g.*, *Lennon v. United States*, 736 A.2d 208, 210 (D.C. 1999) (quoting *United States v. Young*, 376 A.2d 809, 813 (D.C. 1997)).

[20] *See Chase Plaza Condo. Ass'n, Inc. v. JPMorgan Chase Bank, N.A.*, 98 A.3d 166, 175 (D.C. 2014)

[21] *See Mistreatment*, THE AMERICAN HERITAGE DICTIONARY (5th ed. 2020); *Mistreatment*, COLLINS ONLINE ENGLISH DICTIONARY; *Mistreatment*, MERRIAM-WEBSTER'S ONLINE DICTIONARY.

or superfluous."[22]  It would not make sense for mistreatment and abuse to constitute independently sufficient bases for temporary emergency jurisdiction if, in fact, those two words mean the same thing.[23]

The UCCJEA's history and District law shed light on the meaning of mistreatment.  The UCCJEA's predecessor was the 1968 Uniform Child Custody Jurisdiction Act (UCCJA), which allowed state courts to make child custody determinations when the ordinary bases for jurisdiction were not satisfied if "it is necessary in an emergency to protect the child because he [or she] has been subjected to or threatened with mistreatment or abuse *or is otherwise neglected*."[24]  The UCCJEA's drafters removed this reference to children who were "otherwise neglected" from the temporary emergency jurisdiction provision, explaining in an official comment that "'neglect' has been eliminated as a basis for the assumption

---

[22] *Crawford v. District of Columbia*, 891 A.2d 216, 220 (D.C. 2006) (internal citations and quotation marks omitted).

[23] *See Kalman v. Fuste*, 52 A.3d 1010, 1019 (Md. Ct. Spec. App. 2012) (finding that "plain meaning of 'mistreatment'" . . . equate[s] it with 'abuse' and impl[ies] that [the UCCJEA] contains a redundancy, which the law abhors").

[24] UCCJA § 3(a)(3) (1968) (emphasis added), available at https://www.uniformlaws.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=91f64d0b-d6b3-d659-3efc-79d87ada25c7&forceDialog=1; https://perma.cc/WP2B-5NCA.

of temporary emergency jurisdiction. Neglect is so elastic a concept that it could justify taking emergency jurisdiction in a wide variety of cases."[25]

That the "drafters of the UCCJEA purposefully excluded 'neglect' as a basis for emergency jurisdiction . . . indicat[es] a heightened standard for use in emergency custody determinations."[26] This does not mean, however, that facts constituting neglect under District law cannot *also* amount to mistreatment. The drafters' primary concern when amending the UCCJA's temporary emergency jurisdiction provision was the extensive variation (or, in their words, elasticity) across state definitions of neglect.[27] Under the former language of the UCCJA,

---

[25] UCCJEA § 204 cmt. (1997), available at https://travel.state.gov/content/dam/NEWIPCAAssets/pdfs/uccjea_final_97.pdf; https://perma.cc/ALL3-7QME. The drafters added that the change was intended to harmonize the UCCJEA with the Parental Kidnapping Prevention Act, a federal statute that also defines an emergency as mistreatment or abuse.

[26] *Kalman*, 52 A.3d at 1019.

[27] *See e.g.*, Ariz. Rev. St. Ann. § 8-201(25) (neglect includes "the inability or unwillingness of a parent . . . of a child to provide that child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes unreasonable harm to the child); Md. Code Ann. § 5-701(s) (neglect is a "failure to give proper care . . . under circumstances that indicate (1) the child's welfare is harmed or placed at a substantial risk of harm; or (2) mental injury to the child or substantial risk of mental injury"); Colo. Rev. Stat. § 19-3-102(1)(c) (child is neglected if "[t]he child's environment is injurious to his or her welfare"); Idaho Code § 16-1602(31)(c) (neglected means, among other things, a child "[w]ho has been placed for care or adoption in violation of law"); Kan. Stat. Ann. § 38-3303(t)(2) (neglect may include "failure to . . . remove a child from a situation that

states with lower legal thresholds for neglect potentially could exercise jurisdiction even in situations that did not involve a true emergency, i.e., "a serious situation or occurrence that happens unexpectedly and demands immediate action."[28] This possibility conflicted with the drafters' mandate that temporary emergency jurisdiction was to be an "extraordinary jurisdiction . . . reserved for extraordinary circumstances."[29] Viewing the drafters' comment in this light, we do not think that their intent in the UCCJEA was to completely rule out neglect as a basis for temporary emergency jurisdiction. Instead, the most sensible reading is that neglect can still, in some cases, rise to the level of mistreatment.

When will this be true? Very few state courts have tried to formulate an independent standard for mistreatment.[30] They have looked to state statutory law for guidance,[31] and we may do the same. The pertinent District of Columbia statutes

---

requires judgment or actions beyond a child's level of maturity, physical condition or mental abilities and that results in bodily injury or a likelihood of harm to the child"); Miss. Code Ann. § 43-21-105(l)(iv) (neglected child is one who "for any reason, lacks the care necessary for his health, morals, or well-being").

[28] *Emergency*, THE AMERICAN HERITAGE DICTIONARY (5th ed. 2020).

[29] UCCJA § 3(a)(3) (1968) cmt.

[30] *See Kalman*, 52 A.3d at 1021 (holding that mistreatment requires "at least a substantial risk of mental or physical injury").

[31] *Id.* at 1020–21 (applying Maryland law to define "mistreatment"); *see also In re N.C.*, 294 P.3d 866, 875 (Wyo. 2013) (noting that "it makes the most sense to

employ cognate terms. Section 16-2301(9)(A)(vi) of the D.C. Code defines a neglected child as one "who has received negligent treatment *or maltreatment* from a parent, guardian, or custodian." The statute then clarifies that the "term 'negligent treatment' or 'maltreatment' means failure to provide adequate food, clothing, shelter, or medical care."[32] Thus, District law characterizes "maltreatment," which we may take as equivalent to or encompassed within "mistreatment," as depriving a child of life's basic necessities.

We think this approach is consonant with the purposes and language of the UCCJEA as well as the UCCJA, whose drafters emphasized that temporary emergency jurisdiction "retains and reaffirms *parens patriae* jurisdiction . . . which a state must assume when a child is in a situation requiring immediate protection."[33] A child whose parent is failing to provide one or more of the fundamentals mentioned above will require swift intervention from the state in which they are

---

apply Wyoming law in defining what constitutes abuse for the purposes of determining emergency jurisdiction under the UCCJEA").

[32] D.C. Code § 16-2301(24) (2012 Repl.).

[33] UCCJA § 3(a)(3) (1968) cmt.; *see also Saavedra v. Schmidt*, 96 S.W.3d 533, 544 (Tex. Ct. App. 2002) ("States have a parens patriae duty to children within their borders, and the possibility that allegations of immediate harm might be true is sufficient for a court to assume temporary emergency jurisdiction in the best interests of the child under the UCCJEA.").

present to ensure their health and safety. That is the quintessential case warranting the exercise of temporary emergency jurisdiction.[34] Moreover, our reliance on this statutory context is not undercut by the fact that the District classifies "maltreatment" as a subset of neglect (and seemingly equates it or puts it on a par with "negligent treatment") because, as we have already explained, the drafters did not intend to completely excise neglect as a basis for temporary emergency jurisdiction under the UCCJEA.

In light of the UCCJEA's history, the drafter's comments, and our own law, we hold that a child is mistreated within the meaning of D.C. Code § 16-4602.04(a) if the child is threatened with or being subjected to imminent harm, including the deprivation of adequate food, clothing, shelter, or medical care.

Turning to the record, we agree with the associate judge that J.W. and Ja.W. were being mistreated. The magistrate judge heard evidence during the probable cause hearing that at the time of removal, the children had been residing in a public train station for over a month, and that appellant had refused a prior offer of free

---

[34] *See In re Vanessa E.*, 597 N.Y.S.2d 672, 674 (N.Y. App. Div. 1993) (emergency jurisdiction is appropriate in a "situation 'vitally and directly' affecting the health, welfare and safety of the subject child") (citation omitted).

shelter for her family. There was no indication that appellant intended to move the children to a more suitable dwelling, even with winter encroaching. Appellant has not disputed any of these facts, which are comparable to, or arguably more severe than, those in other cases where state courts have approved the exercise of temporary

emergency jurisdiction under the UCCJEA.[35]   Accordingly, we conclude that the

magistrate judge had jurisdiction over J.W. and Ja.W.'s neglect proceeding.[36]

---

[35]   *See In re E.X.J.*, 662 S.E.2d 24 (N.C. Ct. App. 2008) (lower court had temporary emergency jurisdiction over minor children who arrived in North Carolina from Alabama, where their mother had no home, money, job, or transportation and refused a free shelter placement); *see also Scott v. Somers*, No. FA044001981S, 2007 WL 241067, at *1 (Conn. Super. Ct. Jan. 10, 2007) (noting that, under prevailing case law "a threat of imminent emotional harm would suffice to exercise temporary emergency jurisdiction"); *Micah M. v. Arizona Dept. of Economic Sec.*, No. 2 CA-JV 2008-0006, 2008 WL 4660219, at *4 (Ariz. Ct. App. May 13, 2008) (holding that temporary emergency jurisdiction applied where father suffered from untreated bipolar disorder, and had not attended to children's medical needs); *In re E.D.*, 812 N.W.2d 712, 717 (Iowa 2012) (ruling that three-year old child was subjected to or threatened with mistreatment or abuse where mother (1) had a history of drug use/criminal activity, (2) associated with registered sex offenders, (3) tested positive for marijuana at the time of removal, and (4) was sleeping when child was discovered outside unsupervised); *In re Guardianship of N.M.*, 358 P.3d 216, 218 (Nev. 2015) (finding risk of mistreatment under the UCCJEA justifying temporary emergency jurisdiction where mother's half-sister came to father's home at night and unsuccessfully attempted to remove the child without permission); *Earney v. Quiloan*, 2016 So. 3d 147, 150 (Fla. Dist. Ct. App. 2016) (holding that father's "undisputed mental health issues and temporary hospitalization sufficiently supported the trial court's finding that temporary emergency jurisdiction was necessary to protect the minor children from abandonment or mistreatment"); *In re J.P.-1*, No. 18-0194, 2018 WL 3006179, at *3 (W. Va. June 15, 2018) (holding that temporary emergency jurisdiction was warranted where mother was a drug addict and left her minor children during the daytime with disabled grandparent who was unable to care for them).

[36]   Once the magistrate judge had properly exercised temporary emergency jurisdiction at the November 20 probable cause hearing, the District was then authorized to retain jurisdiction because there was no other custody order or proceeding initiated in the children's home state of Georgia.  *See* D.C. Code § 16-4602.04(b).  Appellant has not challenged this continuing jurisdiction.

## B. Neglect Due to Lack of Proper Parental Care or Control

Appellant argues that the evidence was insufficient to support the magistrate judge's finding that her children were neglected under D.C. Code § 16-2301(9)(A)(ii); i.e. that they were "without proper parental care or control, . . . [or] education as required by law . . . and the deprivation [wa]s not due to the [appellant's] lack of financial means." Appellant contends the record did not adequately show that her failure to provide shelter and enroll the children in school was not attributable to lack of financial means.

We disagree. We need not address appellant's failure to enroll her children in school, because she does not contend (nor could she) that choosing to live in a public train station with two minor children constitutes proper parental care or control. As the associate judge observed, appellant

> makes no effort to address [the magistrate judge's] finding, based on stipulated facts, her admissions, and her statements to a witness, Mr. Cyphers, that she was offered *free* shelter housing through the Virginia Williams Resource Center for herself and her children prior to the removal, yet refused the offer. . . . [Appellant] asserts no argument upon which the Court could find that [this] finding[] w[as] erroneous, and . . . [it is] independently sufficient to support a conclusion that failure to provide

the minor children with appropriate shelter was not due to lack of financial means.

The record demonstrates that appellant was living with her children in Union Station not because she could not afford to live anywhere else, but because she thought it was the "safer" option for her family, a perception that led her to refuse a costless offer of housing.[37] There is no factual support in the record for appellant's belief that the offered shelter at VWFRC was unsafe, or that Union Station was a safer or even a reasonable place in which to shelter her children; nor has she argued on appeal that her reason for shunning the VWFRC shelter was justified by grounded safety concerns. Accordingly, the magistrate and associate judges had ample basis for

---

[37] Appellant attempts to undermine the record evidence by asserting that the magistrate judge should not have given significant weight to her unanswered admission that "[p]rior to removal, [appellant] was offered free shelter housing for herself and her children in Washington, D.C., [which she] refused, alleging safety concerns." Our case law forecloses this argument. See *In re K.M.*, 164 A.3d 945, 949–51 (D.C. 2017) (trial court could accord significant weight to parents' admissions under Sup. Ct. R. Civ. P. 36 after parents failed to respond to requests for admissions from CFSA in neglect proceeding regarding their child); *see also* Sup. Ct. R. Civ. P. 36(a)(3) ("A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney.") and (b) ("A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."); Super. Ct. Neg. R. 1(b) (Rules of Procedure governing discovery in civil proceedings are "deemed applicable" to neglect proceedings). Appellant did not move to withdraw or amend any of her admissions.

concluding that her failure to provide her children with proper care did not stem from financial hardship.[38]

## C. Neglect Due to Mental Incapacity

"In order to make out a case of neglect under D.C. Code § 16-2301(9)(A)(iii), the government must prove both that a parent has a mental incapacity and that the mental incapacity has caused their 'inability to provide proper care,' i.e., that there is a nexus between the mental incapacity and their lack of care for the child."[39] The neglect statute does not define the term "mental incapacity." Our cases have "reject[ed] efforts to interpret it too narrowly."[40] We have held, for example, that a parent does not need to have a "diagnosable mental illness" for a court to find mental incapacity supporting an adjudication of neglect under section (9)(A)(iii).[41]

---

[38] *See In re A.H.*, 842 A.2d 674, 688 (D.C. 2004) ("[W]here there is no nexus between the act underlying the ultimate finding of neglect and the mother's financial circumstances, it is plain enough without the need for other evidence that the deprivation is due to reasons other than a lack of financial means.") (internal citation and quotation marks omitted).

[39] *In re B.C.*, 257 A.3d 451, 461 (D.C. 2021) (citing *In re P.B.*, 54 A.3d 660, 667 (D.C. 2012) (quoting *In re N.P.*, 882 A.2d 241, 251 (D.C. 2005))).

[40] *Id.* at 462.

[41] *In re N.P.*, 882 A.2d at 251; *see also In re B.C.*, 257 A.3d at 462 ("'mental incapacity' encompasses, but is not limited to, debilitating mental illness").

Addressing the question most recently, this court declared that, for purposes of (9)(A)(iii), mental incapacity "encompasses a range of psychiatric, psychological, or physiological conditions that may adversely impact a parent's thought processes[,] [b]ut those conditions must be related to mental functioning, and they must be 'incapacitating,' i.e., they must pose a serious impediment to the parent's ability to navigate their daily life."[42]

Crediting, in particular, the unrebutted testimony of Ms. Buchinski, Ms. White, and Dr. Clegg, and appellant's own admissions, the magistrate judge found that appellant was "suffering from some sort of mental incapacity which has caused her to believe that she and the children are being followed and that the children's father and others are trying to kill them." "Based on her delusional and disordered thinking and beliefs," the magistrate judge found, "[appellant] has isolated the children from the world and made them fearful and mistrustful of others, including their father." The magistrate judge further found that "[appellant's] mental incapacity has caused her to refuse an offer of shelter from the Virginia Williams Center, to allow her children to live in Union Station, and to allow the children to go without education."

---

[42] *In re B.C.*, 257 A.3d at 462.

The evidence supporting these findings was current, not historical or out-of-date.[43] Ms. White and Dr. Clegg, the witnesses who testified to the children's mental health difficulties and their source in appellant's paranoia and disordered beliefs, were both qualified as experts. Ms. Buchinski, who testified unequivocally that appellant was paranoid and exhibiting delusions, was a social worker who, though not formally qualified as an expert, was trained to recognize signs of mental illness. Thus, we are satisfied that appellant's mental incapacity and its consequences for her children were sufficiently "substantiated with expert testimony," as we have emphasized is generally, if not always, required.[44] In addition, the mental health evaluations were corroborated by the testimony of the other witnesses and by appellant's own admissions.[45] There was no evidence at trial to the contrary. Appellant's objection that she had not been diagnosed with a mental illness is not well-taken, for appellant herself obstructed the magistrate judge's effort to obtain a diagnosis of her mental condition by refusing to comply with the court's order for

---

[43] *See id.* at 464 (cautioning that "when assessing a parent's mental incapacity, the trial court must also take care not to rely too heavily on dated and potentially stale information").

[44] *Id.* at 463.

[45] Contrary to appellant's objection, the trial court was entitled to accord significant weight to appellant's failure to deny the requested admissions. See note 37, *supra*.

an evaluation.  The record does not indicate that there existed and were available any mental health records pertaining to appellant that conceivably might have provided an alternative basis for a diagnosis.  As we have said, a court may find (9)(A)(iii) neglect without such a diagnosis, and when the evidence permits the court to do so, the parent's unjustified refusal to cooperate should not stand in the way.[46]

We are satisfied that the magistrate judge's credibility determinations and factual findings were not clearly erroneous and no error of law has been shown.  The credited evidence clearly sufficed to prove both that appellant had an untreated "mental incapacity" as we defined that term in *In re B.C.*, and that there was a substantial and direct nexus between appellant's debilitating mental condition and her failure to provide appropriate care for her children.  That failure went beyond the obvious physical and material deprivation of living for a month, and indefinitely, in a public train station without attending school.  There is no doubt that appellant loves her children and did not intentionally neglect or harm them.  But as their therapists testified, appellant convinced J.W. and Ja.W. of her persecutory delusion

---

[46] *Cf. In re B.C.*, 257 A.3d at 463 n.10 (noting that, in that case, there was "no information in the record about [the appellant parent's] compliance" with the orders for a mental health evaluation, and that the parent's "compliance was not essential to the presentation of expert testimony, which could have been based on [her] medical records").

that their lives were in jeopardy because their father was out to kill them, and the children were isolated, traumatized, fearful, and reluctant to trust anyone outside the family unit.

The present case is comparable to two previous cases in which this court upheld neglect adjudications under D.C. Code § 16-2301(9)(A)(iii), namely *In re E.H.*[47] and *In re P.B.*[48] In the first case, we found the required nexus where the child's life "was dominated by her mother's delusions" regarding "imaginary toxic fumes."[49] These delusions prompted the mother to sleep outside with the child on an upper-floor balcony, keep open windows regardless of temperature, and store food items in the living room.[50] "Moreover," we said, much as in the present case, "the mother's 'hyper-vigilance' led her to suspect the members of her family, the father of her child, and other people, of plotting against her and of attempting to do harm to her and to [her child] as well. [The mother's] outlook, according to [the testifying expert] was one of suspicion, anger, and isolation from others. The trial

---

[47] 718 A.2d 162 (D.C. 1998).

[48] 54 A.3d 660 (D.C. 2012).

[49] *In re E.H.*, 718 A.2d at 170.

[50] *Id.*

judge was not required to overlook the obvious danger that some or all of these traits might well have negative consequences for this particular child."[51]

In *In re P.B.*, this court again held there was sufficient evidence to establish the requisite link between a parent's mental instability and her inability to properly care for her children. Much as in this case, "witnesses . . . described [the mother's] paranoid beliefs, delusional thinking, and seclusion"; there was expert testimony that the mother's behavior "supported the existence of a mental illness" even though there had not been "enough of an assessment . . . to confirm that she suffered from a particular mental illness"; and experts testified that the mother's "delusional, paranoid, and agitated behavior would cause her children anxiety and fear, preoccupy her, and otherwise impair her ability to provide parental care."[52]

In the present case we reach the same conclusion as this court did in *In re E.H.* and *In re. P.B.* Here, too, the magistrate judge and associate judge were "not required to overlook the negative effects of [appellant's] apparent mental health issues on her children."[53]

---

[51] *Id.* at 171.

[52] *In re P.B.*, 54 A.3d at 667.

[53] *Id.*; *cf. In re K.M.*, 75 A.3d 224, 231–34 (D.C. 2013) (evidence was insufficient to support a determination of neglect due to mental incapacity where

**III.**

For the foregoing reasons, we hold that the Superior Court properly exercised temporary emergency jurisdiction in these child custody proceedings. We further hold that the District presented sufficient evidence to prove that J.W. and Ja.W. were neglected children within the meaning of D.C. Code §§ 16-2301(9)(A)(ii) and (9)(A)(iii). We thus affirm the judgments of the Superior Court.

---

there was no expert testimony as to whether child had suffered mental or emotional injury from his mother's delusions).